UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | NO. 3:CR-20- 228 |
|---|---|---|
| | : | |
| v. | : | (Judge      ) |
| | : | |
| KURT MORAN, | : | |
| Defendant | : | |

## I N D I C T M E N T

**THE GRAND JURY CHARGES:**

### Introduction

At times material and relevant to this Indictment:

1.    The defendant, Kurt MORAN (MORAN), was a medical doctor. MORAN was a physician licensed by the Commonwealth of Pennsylvania and held a Pennsylvania medical license, as well as a Drug Enforcement Administration (DEA) registration number, and operated a medical practice in Scranton, Lackawanna County, within the Middle District of Pennsylvania.   MORAN represented himself to be a specialist in internal medicine and pain management.

### The Controlled Substances Act

2.    The Controlled Substances Act (the Act) governs the manufacture, distribution, and dispensing of controlled substances in the United States.   Under the Act, there are five schedules of controlled substances – Schedules I, II, III, IV, and V.   Controlled substances are scheduled into these levels depending on their potential for abuse, likelihood of physical or psychological dependency, accepted

1

medical use, and accepted safety for use under medical supervision.

3.     The term "Schedule II" means the drug or other substance has a high potential for abuse, the drug has a currently accepted medical use with severe restrictions, and abuse of the drug or other substances may lead to severe psychological or physical dependence.   Certain Schedule II drugs have a high potential for abuse.   This abuse can lead to addiction, overdose, and sometimes death.

4.     Title 21, United States Code, Section 841(a)(1), provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person to knowingly or intentionally ... manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance."

5.     Title 21, United States Code, Section 821, provides that "[t]he Attorney General [of the United States] is authorized to promulgate rules and regulations relating to the registration and control of the manufacture, distribution and dispensing of controlled substances."

6.     The Attorney General of the United States has exercised his rulemaking authority regarding the dispensing of controlled substances through the promulgation of 21 Code of Federal Regulations § 1306.04, governing the issuance of prescriptions, which provides, among other things, that a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.

Moreover, an order purporting to be a prescription issued not in the usual course of professional treatment is not a prescription within the meaning and intent of section 309 of the Act [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the law relating to Controlled Substances.

7.    Under Title 21, United States Code, Section 802(21) the term practitioner is defined as a "physician . . . . registered, or otherwise permitted by the United States or the jurisdiction in which he practices . . . to distribute, dispense, . . . administer, . . . a Controlled Substance in the course of professional practice . . ." Under Title 21, United States Code, Section 822(a)(2), every person or entity who handles Controlled Substances must be registered with Drug Enforcement Administration (DEA) or be exempt by regulation from registration.   The DEA registration grants practitioners federal authority to handle Controlled Substances. However, the DEA registered practitioner may only engage in those activities that are authorized under state law for the jurisdiction in which the practice is located.

8.    Title 21, Code of Federal Regulations, Sections 1306.05, 1306.11, and 1306.21 require a prescription for a Controlled Substance to be dated as of, and signed on, the day issued, bearing the patient's full name and address, the drug name, strength, dosage form, quantity prescribed, directions for use, and the name, address, and DEA registration number of the prescriber.

9.    Title 21, United States Code, Section 802(10), provides that the term

3

"dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for delivery.

10.     Title 21, United States Code, Section 802(11), provides that the term "distribute" means to deliver (other than by administering or dispensing) a controlled substance or a listed chemical.   The term "distributor" means a person who so delivers a controlled substance or a listed chemical.

11.     The Pennsylvania Code of Professional and Vocational Standards, Title 49, Chapter 16.92, defines the authority of physicians licensed by the Commonwealth of Pennsylvania to prescribe or dispense controlled substances. Chapter 16.92 provides minimum standards that shall be followed when prescribing or dispensing controlled substances and include: (a) the taking and recording of an initial medical history, (b) reevaluations of the condition diagnosed and the controlled substance involved, (c) patient counseling, and maintenance of patients' medical records.

12.     As a medical doctor, MORAN was authorized to prescribe and/or dispense to patients Schedule II through V controlled substances and to prescribe medicine to patients, including controlled substances, for legitimate medical purposes and in the usual course of professional practice.   Many of the prescriptions written by MORAN were not written for legitimate medical purposes

4

and were not issued in the usual course of professional practice.

13.     Many of the prescriptions authorized by MORAN by way of MORAN pre-signing blank prescriptions and allowing other employees to fill in the remainder of the prescription, did not reflect MORAN's honest exercise of good professional judgment as to the patient's medical necessities.   Said prescriptions based only on the judgment of an employee and not on the professional judgment of MORAN but authorized by MORAN were not valid prescriptions under the law.

14.     Oxycodone is a Schedule II narcotic (opioid) pain medicine with a high potential for abuse and addiction, and associated risk of fatal overdose due to respiratory depression.   Oxycodone is sold generically or under a variety of brand names, including OxyContin, Roxicodone, Percocet, and Endocet.

15.     Fentanyl is a Schedule II narcotic (opioid) pain medicine that has a high risk for abuse and addiction, and associated risk of fatal overdose due to respiratory depression.   Fentanyl is approximately 70 -100 times more potent than morphine.   A fentanyl transdermal system (fentanyl patch) contains a high concentration of the potent Schedule II opioid agonist, fentanyl.   Fentanyl is sold generically or under a variety of brand names, including Subsys and Duragesic.

16.     Benzodiazepine is the generic name for a class of psychoactive drugs that are used to treat a variety of medical issues, including depression, panic disorders, anxiety disorders, and insomnia, among others.   The use of benzodiazepines can lead to physical and/or psychological dependence, and abuse of

these drugs may result in addiction.   The benzodiazepine class of drugs is classified as Schedule IV Controlled Substances.   Common brand names of benzodiazepines include Xanax (generic: alpraxolam); Valium (generic: diazepam), and Klonopin (generic: clonazepam), among others.

17.     The Pennsylvania Prescription Drug Monitoring Program (PDMP) collects information on all filled prescriptions for controlled substances.   A prescription drug monitoring report contains prescription data for all Schedule II through Schedule V controlled substances dispensed by pharmacies in the Commonwealth of Pennsylvania.   Pharmacies are required by law in Pennsylvania to report the patients name, the particular controlled substance and dosage dispensed, quantity dispensed, number of days supplied, prescribing physician's name, DEA registration number, and the dispensing pharmacy's name and DEA registration number.

### Medicare, FEHBP, Private Insurers

18.     The Medicare program is a federally-funded health care benefit program that provides health care benefits to people 65 years of age or older, or to certain disabled persons.   Medicare is a "Federal health care benefit program" as defined by Title 18 United States Codes, Sections 24(b) and 1347.   Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the U.S. Department of Health and Human Services ("HHS").   Medicare is a "Federal health care benefit program" as defined by Title 18 United

States Codes, Section 24(b).   Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

19.   The Medicare program also includes a prescription drug program known as "Part D," which is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury.   The Part D program is administered by various "Plan Sponsors," each of which dictates the specific drugs it will cover and how much it will pay for those medications.   CMS, through the federal treasury, reimburses the Part D Plan Sponsors for the covered drugs.

20.   The Federal Employees Health Benefits Program ("FEHBP") is a federally funded medical insurance program created to provide health insurance for federal employees, annuitants, and their spouses and dependent unmarried children under the age of twenty-six.   Health insurance coverage is made available through contracts with various health insurance carriers, and federal employees and annuitants can choose from a variety of insurance plans.   The program is administered by the United States Office of Personnel Management ("OPM").

21.   NALC (National Association of Letter Carriers) and GEHA (Government Employees Health Associations, Inc.) are two insurance carriers that provide health insurance through FEHBP.   NALC and GEHA require physicians to provide a diagnostic code and a procedure code on claims in order to be paid for professional services rendered to FEHBP beneficiaries.

22.     Private health insurers ("private insurers") are also health care benefit programs under Title 18, United States Code, Sections 24(b) and 1347.

23.     In Pennsylvania, there are numerous "Plan Sponsors" that administer the Medicare Part D program and cover Pennsylvania residents, including but not limited to Express Scripts, SilverScript, Anthem, Humana, AARP, and Highmark Blue Cross/Blue Shield.

24.     Medicare, FEHBP, and private insurers prohibit payment for items and services that are not "reasonable and necessary" to diagnose and treat an illness or injury.   Controlled substance prescriptions written outside the usual course of professional practice and not for a legitimate medical purpose are medically unnecessary and ineligible for payment.

25.     In order for Medicare, FEHBP, and private insurers to pay for medications, they have to be prescribed by a physician.   Physicians can enroll as Medicare, FEHBP, and private insurance providers.   To enroll in Medicare, for example, providers have to agree to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors.

26.     Medicare, FEHBP, and private insurer regulations require enrolled health care providers to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services are provided.

8

27.     Medicare, FEHBP, and Private Insurers pay for claims only if the services are medically reasonable and necessary.   Medicare, FEHBP, and Private Insurers will not pay for medications if the prescriptions were written in exchange for a bribe or kickback, or for medications written outside the usual course of professional practice and not for a legitimate medical purpose.

28.     The United States Department of Labor ("DOL"), Office of Workers' Compensation Programs ("OWCP"), administers benefits payable under the Federal Employees' Compensation Act ("FECA"), which provides medical payments and compensation benefits to federal employees who sustain on the job injuries. Employees of the United States Postal Service ("USPS") who become disabled due to occupational injuries which they sustained in the performance of their job duties could become qualified for OWCP benefits.   Health care programs administered by OWCP are "health care benefit programs," as defined by Title 18, United States Code, Section 24(b).

29.     Medical providers who provide services to OWCP claimants are required to enroll with OWCP.   OWCP requires medical providers to submit claims for payment for services actually rendered.   OWCP imposes restrictions on enrolled medical providers to ensure that they bill only for legitimate claims.   DOL regulations state that by submitting a bill and/or accepting payment, the provider signifies that the service for which reimbursement is sought was performed as described, necessary, appropriate, and properly billed in accordance with accepted

industry standards.   OWCP pays for claims only if the services are medically reasonable and necessary.

### Insys and Subsys

30.    Insys Therapeutics, Inc. ("Insys") is a company incorporated in Delaware and headquartered in Chandler, Arizona.

31.    In or around January 2012, the U.S. Food and Drug Administration ("FDA") approved Insys's application to market a drug called Subsys to patients suffering from breakthrough cancer pain.   Breakthrough cancer pain is a sudden, short-term increase in pain that may occur in patients who have chronic pain from cancer.

32.    Subsys is a potent opioid containing fentanyl that was designed to rapidly enter a patient's bloodstream upon being sprayed under the tongue. Fentanyl is approximately 70 - 100 times more potent than morphine, and approximately 50 times more potent than 100% pure heroin.   Fentanyl produces effects similar to the opioids morphine and heroin, but fentanyl has a greater potency and a shorter duration of action.   Fentanyl is rapidly distributed to the brain, heart, lungs, kidneys and spleen.

33.    The FDA approved Subsys solely for the "management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to around-the-clock- opioid therapy for their underlying persistent cancer pain."

34.    Subsys is a category of drugs known as Transmucosal Immediate

Release Fentanyl ("TIRF").   Because of the risk of misuse, abuse, addiction, and overdose associated with TIRF drugs, including Subsys, only practitioners enrolled in the FDA-mandated TIRF Risk Evaluation and Mitigation Strategy program (the "TIRF REMS Program") are allowed to prescribe TIRF drugs.   Practitioners are required to complete training and testing to enroll in the TIRF REMS Program.

35.    This "TIRF REMS" Access Program consists of a restricted distribution program.   Accordingly, in each instance in which a patient is prescribed Subsys, both the prescriber and the patient are required to complete and submit a Patient-Prescriber Agreement Form detailing the risks and obligations imposed on both parties when a fentanyl product is prescribed.

36.    Before prescribing a TIRF drug like Subsys to a patient, the prescriber is required to complete and sign a REMS form which explicitly states, "I understand that TIRF medications are indicated only for the management of breakthrough pain in patients with cancer, who are already receiving, and who are tolerant to, around-the-clock opioid therapy for their underlying persistent pain."

37.    Subsys was approved for use in dosages of 100, 200, 400, 800, 1200 or 1600 micrograms.

38.    Subsys was expensive and was profitable for Insys.   Virtually all of Insys's profits came from the prescribing of Subsys by health care providers in the United States.   Depending upon the dosage and number of units prescribed, a prescription for Subsys usually costs thousands of dollars per month.   The higher

the dosage, the more expensive the drug is.   For example, the approximate average retail cost of a one-month supply of four daily doses of Subsys at 800 micrograms is approximately $15,000.   Most patients rely upon commercial insurance and/or publicly-funded insurance, including Medicare, to subsidize the cost of Subsys.

### Count 1
### Conspiracy to Defraud the United States and
### Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

39.   The allegations contained in paragraphs 1 through 38 of this Indictment are incorporated herein.

40.   From in or around March 2014 through in or around January 2017, in the Middle District of Pennsylvania and elsewhere, the defendant,

**KURT MORAN**

did willfully and knowingly, combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to commit certain offenses against the United States, namely:

a.   to defraud the United States by cheating the United States Government and any of its agencies out of money or property, and by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government function of HHS in its administration and oversight of Medicare, and the lawful government functions of the FDA in its administration and oversight of the TIRF REMS Program;

12

b.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(B), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, or item for which payment may be made in whole or in part under the Federal health care program; and

c.      to violate Title 42, United States Code, Section 1320a7b(b)(2)(B), by knowingly and willfully offering and paying remuneration, specifically kickbacks and bribes, directly and indirectly, overtly and covertly, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

### Object of the Conspiracy

41.     It was the object of the conspiracy for MORAN and his co-conspirators to unlawfully enrich themselves by, among other things: (a) offering, paying, soliciting, and receiving kickbacks and bribes in exchange for prescribing Subsys; (b) submitting and causing the submission of false and fraudulent claims to Medicare, FEHBP, and private insurance companies for the drug Subsys in various dosages that were medically unnecessary and ineligible for reimbursement; (c) concealing the submissions of false and fraudulent claims to Medicare, FEHBP, and private insurance companies; (d) concealing the receipt and transfer of proceeds of

the fraud; and (e) diverting proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators.

### Manner and Means of the Conspiracy

42.     The manner and means by which MORAN and his co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

a.     MORAN applied for and maintained various Medicare, U.S. Drug Enforcement Administration, TIRF REMS, and other provider numbers associated with MORAN personally, and his medical practice.

b.     Beginning in or around 2007 through the present, MORAN falsely certified to Medicare that he would comply with all Medicare rules and regulations, including that he would not present or cause to be presented a false or fraudulent claim for payment by Medicare and that he would refrain from violating the federal anti-kickback statute.

c.     In or around May 2012, MORAN falsely certified to the FDA that he would assess patients to whom he prescribed TIRF drugs, including Subsys, "for appropriateness of the dose" of the TIRF drug, and "for signs of misuse and abuse" at "all follow-up visits."   MORAN also certified that he understood that TIRF drugs, including Subsys, were "indicated only for the management of breakthrough pain in patients with cancer, who are already receiving, and who are tolerant to, around-the-clock opioid therapy for their underlying persistent pain," and that "an

14

increased risk of misuse, abuse, or overdose" of TIRF drugs "should be considered" before prescribing.

  d. Due to the limited number of patients suffering from breakthrough cancer pain, Insys, by and through its officers, managers, and employees, designed and implemented an illegal kickback and bribery scheme to induce MORAN and others to prescribe Subsys for pain caused by conditions other than breakthrough cancer pain.

  e. In order to conceal and disguise that kickbacks and bribes were being paid to induce MORAN and other doctors to prescribe Subsys, Insys falsely designated the payments to MORAN and other doctors as "honoraria" for purportedly providing educational presentations regarding Subsys ("Speaker Programs").

  f. Insys established the Speaker Program in or around 2012 to compensate doctors for purportedly providing educational programs to licensed health care professionals who had capacity to prescribe Subsys and educate them about the drug.

  g. Insys selected MORAN and other doctors to deliver Speaker Programs based on their prescribing practices and their willingness to prescribe Subsys.  In reality, the primary purposes of the Speaker Program were to provide a financial reward to providers who were prescribing Subsys and to incentivize those providers to continue to prescribe Subsys in the future.

h.     In or around August 2014, MORAN entered into a written agreement with Insys wherein he agreed to be paid to provide Speaker Programs.   MORAN falsely represented that the Speaker Program would be of a professional quality conforming to generally accepted industry standards and practices.   MORAN further falsely represented that the Speaker Program honoraria he received from Insys would be consistent with "fair market value" and would not affect his decisions about prescribing Subsys.

i.     MORAN solicited approximately $140,000 in illegal kickbacks and bribes from Insys for purportedly providing Speaker Programs.

j.     In exchange, MORAN prescribed millions of micrograms of Subsys to patients for whom Subsys was medically unnecessary, who did not suffer from breakthrough cancer pain and, in fact, had no cancer diagnosis, who were not eligible for insurance reimbursement, and who had diminished understanding and appreciation of the powerful breakthrough cancer pain opioid prescribed by MORAN.

k.     MORAN, employees of Insys, and others concealed and disguised that MORAN's Speaker Programs for Insys were a sham; they lacked the appropriate audience of licensed practitioners seeking educational information regarding Subsys; individuals who were simply friends and/or family members of MORAN attended multiple Speaker Programs; there was no presentation about Subsys at many events; the same attendees attended over and over again; and MORAN

conducted purported Speaker Program presentations at which the names of individuals who did not attend were forged on sign-in sheets.

l.      MORAN, employees of Insys, and others fabricated, falsified, altered, and caused the fabrication, falsification, and alteration of sign-in sheets and other documents to falsely make it appear that MORAN's Speaker Programs were legitimate.

m.      Many of the Speaker Programs lacked an appropriate audience of peer-level practitioners seeking education regarding Subsys.   Instead, the Speaker Programs were frequently attended by Insys employees, practitioners with no potential to prescribe Subsys given their medical specialty, others with no professional reason to attend an educational presentation regarding Subsys, and/or the friends and office staff of MORAN.

n.      Insys facilitated the hiring of MORAN's brother-in-law, at MORAN's suggestion and encouragement, and paid the brother-in-law a lucrative salary. The brother-in-law worked within MORAN's office to scour patient charts for likely candidates for Subsys prescriptions, and then worked to obtain approval from insurance providers for payment for Subsys.

o.      MORAN caused Medicare, other federal health care benefit programs, and private insurers to pay millions of dollars for Subsys prescriptions that were procured by the payment of kickbacks and bribes, medically unnecessary, and/or not eligible for insurance payments.

p      In 2014, Insys paid MORAN approximately $25,000.   In that same year, MORAN wrote approximately 182 prescriptions for Subsys to patients with no cancer diagnosis and for whom MORAN was not treating for breakthrough cancer pain.

q.      In 2015, Insys paid MORAN approximately $113,000.   In that same year, MORAN wrote approximately 308 prescriptions for Subsys to patients with no cancer diagnosis and for whom MORAN was not treating for breakthrough cancer pain.

### Overt Acts in Furtherance of the Conspiracy

43.      In furtherance of the conspiracy, and to accomplish its purposes and objects, MORAN and his co-conspirators committed or caused the commission of the following overt acts, among others, in the Middle District of Pennsylvania and elsewhere.

44.      On or about September 11, 2014, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at POSH at the Scranton Club in Scranton, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment from Insys for the purported Speaker Program on his date.

45.      On or about September 16, 2014, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at the Blu Wasabi in Chinchilla,

18

Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment from Insys for the purported Speaker Program on his date.

46.     On or about September 22, 2014, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at the Blu Wasabi in Chinchilla, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment from Insys for the purported Speaker Program on his date.

47.     On or about October 14, 2014, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at Carl Von Lugar in Scranton, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment from Insys for the purported Speaker Program on his date.

48.     On or about October 16, 2014, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at the POSH at the Scranton Club in Scranton, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment

from Insys for the purported Speaker Program on his date.

49.     On or about October 17, 2014, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at Delfrisco in Philadelphia, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $3,200 payment from Insys for the purported Speaker Program on his date.

50.     On or about October 24, 2014, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at Delfrisco in Philadelphia, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $3,200 payment from Insys for the purported Speaker Program on his date.

51.     On or about October 27, 2014, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at Ruth's Chris Steak House, in Wilkes-Barre, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment from Insys for the purported Speaker Program on his date.

52.     On or about October 28, 2014, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at the Sambucca Grill in Scranton,

Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment from Insys for the purported Speaker Program on his date.

53.    On or about October 29, 2014, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at the POSH at the Scranton Club in Scranton, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment from Insys for the purported Speaker Program on his date.

54.    On or about October 30, 2014, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at the Blu Wasabi in Chinchilla, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment from Insys for the purported Speaker Program on his date.

55.    On or about January 6, 2015, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at the Sambucca Grill in Scranton, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment from

Insys for the purported Speaker Program on his date.

56.    On or about January 16, 2015, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at Scossa Restaurant, Easton Maryland.   No meaningful presentation actually took place and only one licensed practitioner actually attended.   The practitioner was not involved in the treatment of breakthrough cancer pain and was subsequently stripped of her medical license in August 2017.   MORAN received a $3,200 payment from Insys for the purported Speaker Program on his date.

57.    On or about January 20, 2015, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at Blu Wasabi in Chinchilla, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment from Insys for the purported Speaker Program on his date.

58.    On or about January 21, 2015, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at POSH at the Scranton Club in Scranton, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment from Insys for the purported Speaker Program on his date.

59.    On or about February 12, 2015, MORAN and his co-conspirators at

Insys purported to provide a Speaker Program at Hong Kong Fusion Restaurant in East Cherry Hill, New Jersey.   No meaningful presentation actually took place and only one licensed practitioner actually attended.   The practitioner was not involved in the treatment of breakthrough cancer pain and was subsequently stripped of her medical license in May of 2018 for having prescribed Subsys outside the usual course of professional practice and not for a legitimate medical purpose.   MORAN received a $3,200 payment from Insys for the purported Speaker Program on his date.

60.    On or about February 17, 2015, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at the Blu Wasabi in Chinchilla, Pennsylvania.   No meaningful presentation actually took place and no licensed practitioners seeking educational information regarding Subsys with the ability to prescribe Subsys actually attended.   MORAN received a $1,900 payment from Insys for the purported Speaker Program on his date.

61.    On or about April 28, 2015, MORAN and his co-conspirators at Insys purported to provide a Speaker Program at the Sambucca Grill, in Scranton, Pennsylvania.   No meaningful presentation actually took place and only one nurse practitioner with no ability to prescribe Subsys actually attended.   The practitioner was not involved in the treatment of breakthrough cancer pain.   MORAN received a $1,900 payment from Insys for the purported Speaker Program on his date.

All in violation of Title 18, United States Code, Section 371.

THE GRAND JURY FURTHER CHARGES:

### Counts 2 through 12
### Receipt of Health Care Kickbacks
### (42 U.S.C. § 1320a-7b(b)(1)(B))

62.   The allegations contained in paragraphs 1 through 38 of this Indictment are incorporated herein.

63.   On or about the dates set forth below, in the Middle District of Pennsylvania and elsewhere, the defendant,

### KURT MORAN

did knowingly and willfully solicit and receive remuneration (including kickbacks and bribes), directly and indirectly, overtly and covertly, in cash and in kind, in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, or item for which payment may be made in whole or in part by Medicare and other federal health benefit programs, as set forth below:

| Ct. | Approx. Date of Payment | Check Number | Payment Amount | Approx. Date and Place of Purported Speaking Program |
|---|---|---|---|---|
| 2 | 1-7-15 | 28576 | $1900 | 1-6-15 -Sambucca Grill, Scranton, PA |
| 3 | 1-26-15 | 34188 (replacement ck) | $1900 | 1-21-15 — POSH, Scranton, PA |
| 4 | 1-30-15 | 29006 | $1,900 | 1-20-15 - Blu Wasabi, Chinchilla, PA |

| 5 | 1-19-15 | 28810 | $3,200 | 1-16-15 – Scossa, Easton, MD |
|---|---------|-------|--------|------------------------------|
| 6 | 2-17-15 | 29346 | $3,200 | 2-12-15 – Hong Kong Fusion, Cherry Hill, NJ |
| 7 | 2-23-15 | 29440 | $1,900 | 2-17-15 - Blu Wasabi, Chinchilla, PA |
| 8 | 4-27-15 | 30801 | $3,200 | 4-23-15 – Creed's Seafood & Steak, King of Prussia, PA |
| 9 | 4-27-15 | 30809 | $3,200 | 4-24-15 – Sullivan's Steak House, King of Prussia, PA |
| 10 | 5-5-15 | 31023 | $1,900 | 4-28-15- Sambucca Grill, Scranton, PA |
| 11 | 7-1-15 | 32445 | $3,200 | 6-19-15 – Sullivan's Steak House, King of Prussia, PA |
| 12 | 8-4-15 | 32985 | $3,200 | 7-30-15 – Belvedere Inn, Lancaster, PA |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B) and Title 18, United States Code, Section 2.

**THE GRAND JURY FURTHER CHARGES:**

**Counts 13 through 327**
**21 United States Code § 841(1)(1)**
**(Unlawful Distribution of Controlled Substances)**

64.     The allegations contained in paragraphs 1 through 38 of this Indictment are incorporated herein.

65.     MORAN's primary method of pain management was to write multiple prescriptions for high dosages of Schedule II, III, and IV Controlled Substances. MORAN routinely prescribed a variety of controlled substances in high dosages outside the usual course of professional practice and not for legitimate medical